**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MARCIA TURNER,**

             **Plaintiff,**

**vs.**

**NEPTUNE TOWING & RECOVERY, INC.,**

             **Defendant.**
_____/

**Consolidated with**                    **Consolidated Case No. 8:09-CV-1071-T-27AEP**

**NEPTUNE TOWING & RECOVERY, INC.,**

             **Plaintiff,**

**vs.**

**DRUMBEAT II, et al.,**

             **Defendants.**
_____/

**ORDER**

Trial in this admiralty cause began on October 26, 2010 on the consolidated and competing claims of the parties. Marcia Turner, the owner of the vessel DRUMBEAT II at the time this action was commenced, filed her *pro se* Amended Complaint against Neptune Towing & Recovery, Inc. seeking possession of the vessel, alleging that Neptune wrongfully towed the DRUMBEAT II on March 9, 2009 from the Hribar residence where she was docked. In addition to wrongful towing, Turner alleged the wrongful arrest of the vessel, conversion and bailment (Dkt. 54).

In its Second Amended Complaint brought against the DRUMBEAT II *in rem,* Neptune seeks to impose maritime liens on the vessel. Neptune alleged that it provided maritime necessaries to the vessel, including towing services and storage. Neptune also seeks to enforce maritime liens

for necessaries provided to the vessel by four other individuals/entities, whose claims have been assigned to Neptune. Neptune further alleges that it is entitled to a maritime lien for salvage services (Dkt. 90). Although Neptune included an *in personam* claim against Turner, that claim was dropped at trial.

Prior to trial, summary judgment was granted *in part* on Turner's Motion for Summary Judgment (Dkt. 38). Turner was declared the owner of the DRUMBEAT II as against Neptune's competing claim to ownership arising from its towing and storage of the vessel. *Id.* The Court determined that Neptune, as salvor, had "the right to possession of the salvaged property, a right exclusive even of the owner, until such time as the salvage lien on the property is extinguished or adequate security for this obligation is given." *Id.*

For reasons never fully explained, in April 2010, Turner transferred her interest in the DRUMBEAT II to her husband, Dennis Workman.[1]  On September 3, 2010, just more than a month before trial was to begin, Workman filed his Verified Statement of Interest as "owner of the sailing vessel DRUMBEAT II" (Dkt. 169). He subsequently filed a *pro se* answer and affirmative defenses to Neptune's claims (Dkt. 233).

The case proceeded to trial on Turner's Amended Complaint. Turner began calling witnesses in support of her claims for damages.[2] During her examination of Viorel Iosipan, the owner of Neptune, Turner suffered an apparent medical crisis and was hospitalized. The trial was continued indefinitely. On Tuesday, July 19, 2011, trial resumed with Turner's direct examination of Iosipan.

---

[1] During trial, Workman acknowledged that an $800,000 judgment was entered against Turner in Monroe County, Florida in May, 2011. Neptune contends Turner's transfer of her interest in the DRUMBEAT II was a fraudulent conveyance as against Turner's creditor(s). This is not an issue in the case and the Court makes no finding one way or the other on it.

[2] By transferring her ownership to Workman, Turner abandoned any claimed possessory rights in the vessel and was relegated to her claims for damages.

Approximately two hours into her direct examination of Iosipan, Turner suffered a second medical event and was hospitalized. Trial was continued to Thursday, July 21, 2011. That morning, Turner and Workman filed their Emergency Motion to Continue Remainder of Trial, and alternatively sought to substitute Workman for Turner or assign her claims to Workman (Dkt. 274). The trial as to Turner's claims for damages was continued, but the motion was denied as to Workman's answer and affirmative defenses and Neptune's *in rem* claims against the vessel (Dkt. 276).

Trial on Neptune's Second Amended Verified Complaint and Workman's answer and affirmative defenses was completed on July 26, 2011. Trial on Turner's damages claim was completed on August 25, 2011. Upon the evidence presented, the Court finds and concludes:

**Maritime liens**

Under federal maritime law, repairers and suppliers of maritime necessaries are entitled to a maritime lien against the vessel, which enables them to seek redress directly against the vessel without having to seek compensation from the owner. *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 870 (11th Cir. 2010). Creditors who provide supplies that are necessary to keep the vessel going are vested with "the right to appropriate the vessel, have it sold, and be repaid from the sale proceeds." *Id*. (quotation omitted). A maritime lien arises "from the moment the debt arises." *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1247 (11th Cir. 1999) (quotation omitted). And a maritime lien is not dependant on who possesses the vessel. The lien "travels with the vessel wherever it goes, regardless of . . . whether or not the lien is recorded." *Crimson Yachts*, 603 F.3d at 871.

The Federal Maritime Lien Act, 46 U.S.C. § 31342, codifies the imposition of maritime liens. The statute expressly provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner– (1) has a maritime lien on the vessel . . . ." To establish

a maritime lien on a vessel pursuant to § 31342, a plaintiff must prove (1) it provided "necessaries;" (2) at a reasonable price; (3) to the vessel; (4) at the direction of the vessel's owner or agent. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005). "'Necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway . . ." 46 U.S.C. § 31301(4). "Necessaries" also includes charges for use of a dock, as well as services provided to the vessel which are necessary for its continued operation, such as transportation of the vessel to a site for repairs. *Board of Com'rs of Orleans Levee Dist. v. M/V BELLE OF ORLEANS*, 535 F.3d 1299, 1314 (11th Cir. 2008); *Farrell Ocean Servs., Inc. v. United States*, 681 F.2d 91, 93 (1st Cir. 1982). "Necessaries" has further been liberally construed to include:

> "what is reasonably needed in the ship's business," such as "goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged."

*M/V BELLE OF ORLEANS*, 535 F.3d at 1314 (quoting *Bradford Marine Inc., v. M/V Sea Falcon*, 64 F.3d 585, 589 (11th Cir. 1995)).

In general, all services reasonably necessary for the operation, navigation, or management of a vessel are subject to a maritime lien. *Inbesa America, Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998). The test is reasonableness, not absolute necessity. *Id.* And the terms in an underlying contract to provide services are not automatically covered by the resulting lien, such as attorney's fees, since attorney's fees of a claimant are not provided to the vessel. *Bradford Marine*, 64 F.3d at 589; *Triton Marine Fuels, Ltd. v. M/V PACIFIC CHUKOTKA*, 671 F. Supp. 2d 753, 760-61 (D. Md. 2009). Pre-judgment interest, however, is recoverable on the outstanding debt. *Triton Marine Fuels*, 671 F. Supp. 2d at 764.

The remaining elements of a claim for necessaries are straightforward. The second element,

the reasonableness of the price, is determined by what is "customary" and "in accord with prevailing charges for the work done and the materials furnished." *Sweet Pea Marine*, 411 F.3d at 1249 (quotations omitted). "This burden may be satisfied by witness testimony that the charges were reasonably in accord with industry standards." *Id.* The third and fourth elements for establishing a maritime lien under § 31342 require proof that necessaries were provided to the vessel at the direction of its owner or agent. *Id.*

Salvage claims are distinct from claims for maritime necessaries, although salvage will give rise to a maritime lien. *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir. Mar. 9, 1981) ("The performance of salvage services, like the furnishing of other services to a ship, gives rise to a maritime lien.").[3] To establish a maritime salvage claim, Neptune must prove that (1) a marine peril existed, (2) it provided services voluntarily or not required under an existing contract or from a special contract, and (3) success in whole or in part, or services rendered which contributed to success. *The SABINE*, 101 U.S. 384, 384 (1879).

Marine peril does not mean that the distress must be immediate and absolute. *Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1968). Reasonable apprehension of peril, whether actual or not, is sufficient, such as where the vessel has encountered damage or misfortune "which might possibly expose her to destruction if the services were not rendered." *Faneuil Advisors, Inc. v. O/S Sea Hawk*, 50 F.3d 88, 92 (1st Cir. 1995) (quotation omitted). On the other hand, merely because a vessel would inevitably have deteriorated due to inattention is not sufficient to support a salvage claim by one who intervenes on behalf of the vessel. *Id.* at 93. "[O]therwise ordinary maintenance, repairs and storage-i.e., 'necessaries'-could easily give

---

[3] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

rise to salvage liens if a vessel's owner were particularly negligent in caring for his or her boat." *Id*.

Salvage claims are not limited to the value of services rendered and may include "a bounty or premium based upon the risk involved in the operation and the skill with which it was performed." *Offshore Marine Towing, Inc. v. MR23*, 412 F.3d 1254, 1257 (11th Cir. 2005) (quoting *Treasure Salvors*, 640 F.2d at 567). The cost to the salvor of performing the service and the benefit to the salvee are measured based on:

> (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

*Id.* (quoting *The Blackwall*, 77 U.S. 1, 14 (1869)).

### Findings of Fact and Conclusions of Law

A recitation of the DRUMBEAT II's journey from Tampa to St. Petersburg and then to the Hribar residence is necessary to place this contentious litigation in context, explain how this dispute arose, and why it has been so protracted. For several years, the DRUMBEAT II, a 68' Irwin sailing vessel, was docked at the Imperial Yacht Basin in Tampa. Because of its size, there were few berths available. In late 2005, Turner and Workman contracted with Michael Maltrap to effect repairs on the DRUMBEAT II, including its generator, fastenings and engine. In Maltrap's words, he was hired "to get the engines running to move it."

Consistent with the observations of virtually everyone who had any contact with the DRUMBEAT II (except her owners and caretaker), Maltrap found the DRUMBEAT II suffering from long term neglect. In his words, she was in "really bad shape." Her valves were malfunctioning,

and her engines would not run. Among other repairs, Maltrap rebuilt the generator, reset the valves, installed a new head gasket, pumped out the generator hoses to clear them of water, changed the oil and filters, replaced bad clamps on the bilge pumps and "got her running." His charges came to $1260.56. He presented an invoice to Steve Hoffman, who he understood to be the captain/caretaker of the DRUMBEAT II. Representative of what became a pattern of nonpayment by Turner and Workman with respect to various maritime vendors who provided necessaries to the DRUMBEAT II, after Maltrap completed his work and submitted his invoice, he never saw or heard from Turner or Workman again. He eventually authorized Neptune to collect his invoice (Neptune's Exh. 4).

As Maltrap was finishing his work on the DRUMBEAT II, Imperial Yacht Basis was closing down. Maltrap telephoned James Bradford at Salt Creek Marina in St. Petersburg to arrange for a slip for the DRUMBEAT II. With the knowledge and consent of her owner, in November, 2005, Maltrap took the vessel to Salt Creek Marina, where he completed his work. Maltrap's testimony established that his charges were reasonable and customary in the industry. While Workman and Hoffman testified that Maltrap's work caused damage to the vessel, the Court finds otherwise. Maltrap presented as a credible witness. The testimony of Workman and Hoffman as to Maltrap's work was not credible. Maltrap's services were expressly requested by the owner(s) of the DRUMBEAT II, who have failed and refused to pay him. The services were reasonable and necessary and are therefore maritime necessaries which may be enforced by a maritime lien in the amount of $1260.56, plus prejudgment interest since November 30, 2005.

When the DRUMBEAT II arrived at Salt Creek Marina in November 2005, Workman and Turner showed up with "two legal pads of work to be done on the vessel." However, no work was performed on the vessel by Salt Creek employees. According to James Bradford, when they began to secure the windless, Workman disagreed with how the work was being performed so no further

work was done.

In December, 2005, Workman hired Lippincott Marine to construct a hard top and do canvas work for the vessel. Lippincott was paid $12,600 for the hard top and was given a $3,000 deposit on an agreed fee of just over $6,000 for the canvas work. The vessel was taken to Steven Lippincott's residence where it remained for approximately four months while the work was completed. According to Lippincott, he performed the work as agreed but Workman presented him with a twelve point dispute. The next day, Lippincott inspected the boat and told Workman he would take the materials he questioned back to his shop for any necessary corrective work. Workman did not object. Lippincott faxed Workman an invoice for the $3,489.55 balance owed.

A week later, Workman denied receiving the fax so Lippincott sent it to him again. He received no response. His registered letter utilizing Turner's address on the Coast Guard documentation for the vessel was returned as undeliverable. Notwithstanding the agreement and Lippincott's repeated attempts to contact Workman, Workman falsely reported to the police on two occasions that Lippincott had stolen the canvas. Ultimately, Lippincott filed a small claims action to collect his invoice but was never able to serve Turner with process.

Lippincott was never paid its invoice of $7,800, which includes the balance due of just under $3,500 for the canvas work, plus storage of the canvas in the Lippincott shop. Lippincott assigned its claim to Neptune for collection (Neptune's Exh. 2). Although the Court finds much of Workman's explanation for not paying Lippincott unreasonable and not credible, particularly with respect to the windows and canvas work, there was at least some work performed which was not objectively satisfactory, the inability to open the refrigerator door. In any event, Workman did not sustain his defense by quantifying that unsatisfactory work. Further, that one aspect of the work does not undermine the validity of Lippincott's overall performance or Turner's failure to pay Lippincott.

Nor would it vitiate Lippincott's maritime lien. *See H & R Yacht Serv., Inc. v. 133' Broward Motor Vessel*, 356 F. App'x 268, 270 (11th Cir. 2009) (breach of warranty of workmanlike service does not defeat a maritime lien).

Based on the testimony, Neptune is entitled to a maritime lien for the upholstery work Lippincott furnished to the DRUMBEAT II at the express direction of her owner(s). Lippincott did testify that, in his understanding of the industry, the canvas work was not a maritime necessary because it was not a necessity and was not required by law. But Lippincott's understanding is not dispositive of the legal question of whether the canvas work falls within the statutory definition of "necessaries." The term "necessaries" is broadly construed to include "what is reasonably needed in the ship's business," such as "goods or services that are useful to the vessel . . . ." *M/V BELLE OF ORLEANS*, 535 F.3d at 1314 (quotation omitted). The canvas work was certainly a good or service that was useful to the vessel. The charge for the work was reasonable, and therefore, a maritime lien properly attached to the vessel. However, Lippincott's charge for storing the canvas was not reasonable and will not be awarded. Therefore, the Court finds that the maritime lien should be limited to the principal amount due of $3,489.55 plus prejudgment interest since December 12, 2005.

During March, 2008, Workman requested a local yacht broker, James Clark, to inspect the DRUMBEAT II for the purpose of selling her. Clark found the vessel to be in "shambles," and her condition a "disaster." She had been neglected for "a long time." Water filled her bilge, covering half of her generators and engine. Her electrical wiring was under water. The vessel was not, in Clark's opinion, seaworthy. He recommended a listing price "if the boat was restored." Ultimately, Clark declined to list the vessel for sale. (Exhs. 39-3; 39-4). Clark's testimony was particularly credible, as he has no interest in this litigation and no business relationship with any party. To the extent that Huffman and Workman's testimony conflicted with Clark's, Clark's testimony is

accepted as credible.

In 2008, Workman commissioned Salt Creek Marina to conduct an inspection of the vessel and report on her condition. Capt. Philip A. Savill prepared a report which detailed the material condition of the vessel's propulsion and electrical systems and described the work required "to restore these systems to reliable functionality." (Neptune's Exh. 1). Contrary to Huffman and Workman's trial testimony that the DRUMBEAT II never took on water to the extent described by Iosipan and other witnesses, the survey noted "previous high water levels pumped from the boat."

Bradford wrote to Turner in September, 2008 recommending that the restorations noted in Capt. Savill's survey be performed. Bradford offered to perform the work and requested removal of the vessel from the marina if the work was not commissioned. Notwithstanding Bradford's appeal to Turner, the DRUMBEAT II remained at Salt Creek Marina essentially unattended until November, 2008. In November, Bradford, after enduring long term difficulties collecting dock fees from Turner, posted an eviction notice on the vessel because Turner had not paid the slip rent for October and November or the invoice for the inspection performed by Capt. Savill, which together totaled $2784.00.

Turner posted a $2784.00 cash bond pursuant to Fla. Stat. § 713.76, with the Pinellas County Circuit Court Clerk (Exh. 23-1), and the vessel was released to her.[4] Salt Creek did not pursue the bond and has never been paid for the outstanding dockage fees. It assigned its invoice to Neptune

---

[4] Fla. Stat. § 713.76(1) provides: "Any lienee may release his or her property from any lien claimed thereon *under this part* by filing with the clerk of the circuit court a cash or surety bond, payable to the person claiming the lien, in the amount of the final bill, and conditioned for the payment of any judgment which may be recovered on said lien, with costs." (emphasis added). Apart from Chapter 713, a marina like Salt Creek has "A possessory lien upon any vessel for storage fees, dockage fees, repairs, improvements, or other work-related storage charges, and for expenses necessary for preservation of the vessel or expenses reasonably incurred in the sale or other disposition of the vessel." Fla. Stat. § 328.17(4)(a). The owner may satisfy and secure release of the vessel by paying "the reasonable expenses and late payment interest incurred under this section . . . ." Fla. Stat. § 328.17(10).

for collection (Neptune's Exh. 1).

Salt Creek's dockage fees and Capt. Savill's invoice are "necessaries" under federal maritime law for which a maritime lien in the amount of $2784.00 attached to the vessel. Notwithstanding the posting of the bond and the release of the vessel to Turner pursuant to state law, Salt Creek's maritime lien was not lost or waived. The bond was posted under Fla. Stat. § 713.76, which allows only the release of property from a "lien claimed thereon *under this part*." (emphasis added). "[T]his part" refers to Florida Statute, Chapter 713, Part II (Miscellaneous Liens), which does not include a marina lien under Fla. Stat. § 328.17(4) and certainly does not include a maritime lien for necessaries under 46 U.S.C. § 31342. Therefore, the bond was ineffective to release Salt Creek's lien from the DRUMBEAT II.

Notwithstanding, under the circumstances, the doctrine of laches stands as a bar to the enforcement of the Salt Creek Marina maritime lien. The doctrine of laches is an equitable remedy which is properly found where there has been a showing of delay that was prejudicial to the defendant's interests. *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1210 n.10 (5th Cir. 1978). "[W]hether a lien is barred by laches 'is a question primarily addressed to the discretion of the trial court . . . .'" *Id.* (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30 (1951)).

Salt Creek's delay in enforcing its lien for dockage fees and Capt. Savill's invoice has not been shown to have been justified. Salt Creek could have pursued the cash bond, but according to Bradford, the process was too expensive. That is not a satisfactory explanation for its delay in enforcing its maritime lien. And the DRUMBEAT II has been prejudiced. After her owner(s) posted a cash bond as ostensibly contemplated by Florida law, the vessel should not now be subjected to a second process for collecting the same amount.

On the parties' stipulation, an order was entered directing that the bond be transferred to this

Court to satisfy Neptune's claim for necessaries supplied by Salt Creek Marina. Because of the potential prejudice of paying the Salt Creek claim twice, Neptune's recovery shall be limited to the bond.

After gaining possession of the vessel, Workman commissioned Captain Randy Banger to tow the DRUMBEAT II from Salt Creek Marina to the waterfront residence of Michael Hribar in Pinellas County. In his answer and defenses, Workman admits this (Dkt. 233, ¶ 26). Banger towed the DRUMBEAT II to the Hribar residence on December 3, 2008 but was never paid for his services. He assigned his invoice of $1356.25 to Neptune (Neptune's Exh. 3). His charge of $175 per hour is reasonable, based on the testimony of Iosipan as to the customary hourly rates for towing vessels, and the fact that Workman authorized Steve Huffman to commission Banger's services at that hourly rate (Neptune's Exh. 3). The towing service performed by Capt. Banger therefore constitutes a maritime necessary which may be enforced by a maritime lien in the amount of $1356.25, plus prejudgment interest since December 3, 2008.

Based on an oral month to month agreement, Turner docked the DRUMBEAT II behind Hribar's residence in Pinellas County, Florida. Huffman stayed on the vessel at times. During the last week in January, 2009, Hribar ordered Huffman to leave the vessel and his property. Huffman called Workman within fifteen minutes to let him know he had been ordered off the Hribar property. When Workman answered, Turner could be heard in the background. Notwithstanding Huffman's call, neither Turner nor Workman returned to Hribar's residence or took any action to retrieve the DRUMBEAT II. Nor did they pay the dock fee for February and March, 2009.

Hribar called Neptune in early March, 2009, advised Iosipan that the vessel had been abandoned, and authorized Neptune to tow it (Neptune's Exh. 5). After notifying the St. Petersburg Police Department, Neptune proceeded to tow the DRUMBEAT II to the St. Petersburg Municipal

Marina in March 2009.

When he boarded the DRUMBEAT II to prepare the vessel for towing, Iosipan found that she had taken on water. The hatches were leaking and there was a significant amount of water in her bilge. She could not sail under her own power. Her batteries were low, preventing her bilge pumps from operating. Her mast step was rusting, there was structural damage to her hull, her fuel tank was fractured, and there was evidence that she had suffered damage in the past because her keel was glassed over.

Iosipan's description of the DRUMBEAT II's condition was confirmed after her arrival at St. Petersburg Municipal Marina. An inspection revealed that every hatch leaked, her engines were inoperable, all of her wiring had been submerged and was corroded, her anchor windless had never been mounted, and her sails suffered from UV damage. She was generally not seaworthy. (Neptune's Exh. 7; photos taken Jan. 2010). A marine surveyor, R.D. Shelley, performed a survey of the vessel which likewise confirmed her disrepair and neglected condition. (Neptune's Exh. 6). Shelley opined that she was worth $85,000. Although Iosipan estimates that she is worth $45,000, Shelley's opinion is accepted.

Considering this evidence, as well as the testimony of James Clark, Jason Taylor[5] and James Bradford, it is apparent and the Court so finds that when Hribar called Neptune to have the DRUMBEAT II towed from behind his residence, she had long been neglected by her owner(s), was not being maintained by her owner(s) and was not seaworthy. She had been effectively abandoned.

---

[5] Taylor, who currently works for Neptune, formerly worked for Salt Creek. He found the vessel's condition "disgusting" and had to pump her numerous times because she leaked so badly. As Salt Creek was a "do it yourself" marina, a vessel's owner or crew typically maintained the vessels moored there. He only saw Huffman on the DRUMBEAT II occasionally, but he would be gone for months at a time. Notwithstanding, since no one was maintaining the vessel, Taylor pumped her as a courtesy, and even replaced her battery cores to enable her bilge pumps to work "for awhile." That Workman insinuated that Taylor trespassed on the vessel underscores the lack of credibility he has with respect to the competing claims.

Hribar essentially had an abandoned vessel moored behind his residence and an unresponsive owner who was not paying the agreed dock fee. Under those circumstances, he had the right to have her towed.

Although "towage" is included in § 31301(4)'s definition of "necessaries," Neptune is not entitled to a maritime lien for towing the DRUMBEAT II. A maritime lien will only attach where necessaries are provided to a vessel "on the order of the owner or a person authorized by the owner . . . ." § 31342. Hribar was not the owner, and Neptune failed to show that he had authority from the owner to order necessaries for the vessel. Section 31341 lists several persons who are "presumed to have authority to procure necessaries for a vessel." The only category into which Hribar arguably fits is "a person entrusted with the management of the vessel at the port of supply." § 31341(a)(3). But Hribar's residence is not a port of supply, and there was no evidence that he was entrusted with the management of the vessel. The towing services were not ordered by a person with authority to bind the vessel, and therefore, no maritime lien attached pursuant to § 31342.

Nor is Neptune entitled to a lien under Florida law. Throughout this litigation, Neptune has relied on Fla. Stat. § 713.78, which provides:

> (2) Whenever a person regularly engaged in the business of transporting vehicles or vessels by wrecker, tow truck, or car carrier recovers, removes, or stores a vehicle or vessel upon instructions from:
>
> (a) The owner thereof;
>
> (b) The owner or lessor, or a person authorized by the owner or lessor, of property on which such vehicle or vessel is wrongfully parked, and the removal is done in compliance with s. 715.07; or
>
> (c) Any law enforcement agency,
>
> she or he shall have a lien on the vehicle or vessel for a reasonable towing fee and for a reasonable storage fee; except that no storage fee

shall be charged if the vehicle is stored for less than 6 hours.

Fla. Stat. § 713.78(2) (emphasis added). The terms "tow truck" and "car carrier" are not defined.

"Wrecker" is defined as:

> <u>any truck or other vehicle</u> which is used to tow, carry, or otherwise transport motor vehicles or vessels <u>upon the streets and highways of this state</u> and which is equipped for that purpose with a boom, winch, car carrier, or other similar equipment.

Fla. Stat. § 713.78(1)(c) (emphasis added). Because the lien conferred by § 713.78(2) is statutory, it must be strictly construed. *See Home Elec. of Dade Cnty., Inc. v. Gonas*, 547 So. 2d 109, 110 (Fla. 1989) (liens which are "purely creatures of the statute" must be strictly construed); *Murrell v. Trio Towing Serv., Inc.*, 294 So. 2d 331, 333 (Fla. 3d DCA 1974) (no common law lien arises where vehicle is towed without owner's consent).

Considering the definition of "wrecker" and the reference to "tow truck" and "car carrier," the plain language of Fla. Stat. § 713.78(2) does not apply to parties such as Neptune that use <u>vessels</u> to transport or tow other vessels on Florida's <u>waterways</u>. Accordingly, Neptune is not entitled to a lien under Fla. Stat. § 713.78(2).[6]

Neptune is, however, entitled to a salvage claim, considering the efforts required to safely tow the vessel. As he prepared to tow the DRUMBEAT II, Iosipan discovered that she had taken on

---

[6] Further, Neptune's claim under Fla. Stat. § 713.78(2) based on providing necessaries is preempted by 46 U.S.C. § 31307, which provides, "This chapter supersedes any State statute conferring a lien on a vessel to the extent the statute establishes a claim to be enforced by a civil action in rem against the vessel for necessaries." Although Fla. Stat. § 713.78 does not expressly provide for an *in rem* action against the vessel, that is precisely what Neptune filed.
    It is immaterial that Neptune is not entitled to a maritime lien under federal law. Section 31307 applies to "any State statute" that allows an *in rem* action to enforce a claim for necessaries. Its preemptive language is not limited to instances where a lien has attached under § 31342. Further, to permit Neptune to pursue a state law lien for necessaries under circumstances where federal law does not allow a maritime lien "would be destructive of the principle of uniformity in federal maritime law" and "would defeat the provisions" of §§ 31341 and 31342. *Kane v. Motor Vessel Leda*, 491 F.2d 899, 900 (5th Cir. 1974); *see Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 188 (5th Cir. 2000) (noting "much of the case law [interpreting the prior version of the Federal Maritime Lien Act] remains persuasive, if not controlling"). Although § 31307 does not preclude enforcement of the underlying debt against the owner, Neptune dropped its *in personam* claims at trial. *See Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol*, 893 F. Supp. 526, 539-40 (E.D.N.C. 1994).

a significant amount of water in her bilge, and her hatches were leaking. Iosipan, with 28 years experience operating vessels, including salvage and towing, and who possesses a Coast Guard Merchant Marine Captain's license with a towing endorsement since 2001, considered the DRUMBEAT II to be in danger of sinking if she was not pumped out, or "dewatered." Simply put, in her condition, she could not be safely towed and would have presented a maritime peril if Neptune towed her without pumping her out. To this day, the DRUMBEAT II must be pumped out after every rain. She was not and is not seaworthy, without appropriate repairs.

The DRUMBEAT II's owner(s) essentially abandoned her without taking the steps necessary to prepare her for safe towing. Given the DRUMBEAT II's condition, Neptune could have refused to tow the vessel. Instead, Neptune voluntarily dewatered the DRUMBEAT II in order to safely remove her from Hribar's residence. These efforts were successful, as she was towed to St. Petersburg Municipal Marina without incident.

Based on the evidence, it is apparent and the Court so finds that Neptune was entitled to a salvage lien from the moment it dewatered the vessel in order to safely tow her to St. Petersburg Municipal Marina. Considering the labor expended by Neptune, the skill and energy required, the value of the property used by Neptune and the risk to which that property was exposed, the risk incurred by Iosipan, the value of the property saved, and the degree of danger from which the property was rescued, Neptune is entitled to a salvage award in the amount of $3000.00, which is secured and enforceable through a maritime lien. *See Offshore Marine Towing*, 412 F.3d at 1257.

After the vessel was towed, Iosipan unsuccessfully attempted to contact Turner using the address on file with the Coast Guard. Ultimately, he found 28 addresses for Turner and her husband. After several unsuccessful attempts to contact Turner, Iosipan received a telephone call from Workman threatening to sue him for unlawful impound. Iosipan then received a telephone call from

an attorney purporting to represent Turner, who demanded $10,000 and attorney's fees. Eventually, Iosipan was contacted by attorney Anthony Cuva on April 29, 2009.[7] By then, Iosipan had published a notice of sale for April 16, 2009, claiming storage at $680 per day for a total in excess of $27,000. Ultimately, there was no sale.[8]

The DRUMBEAT II remains at the St. Petersburg Municipal Marina, where she has been moored at Neptune's cost since March 2009. Pursuant to a warrant issued by the Magistrate Judge, the vessel was arrested on December 10, 2009 by the U.S. Marshal, based on unsatisfied maritime liens. Neptune was appointed substitute custodian. In this role, Neptune has continued to incur costs in storing and maintaining the vessel.

Neptune is entitled to reimbursement for the reasonable expenses it incurred in caring for the salvaged property before it was taken into custody by the Marshal. *See, e.g., Beach Salvage Corp. of Fla. v. The Cap't. Tom*, 201 F. Supp. 479, 486 (S.D. Fla. 1961) (ordering reimbursement of expenses incurred by salvor); *The Lamington*, 86 F. 675, 677-78 (2d Cir. 1898) (disbursements properly made by salvors are to be repaid); 3A Benedict on Admiralty § 212 (2011). Neptune is likewise entitled to recover the reasonable expenses it has incurred as substitute custodian. *See Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration*, 668 F.2d 811, 816 (5th Cir. 1982); *Mullane v. Chambers*, 438 F.3d 132, 138-39 (1st Cir. 2006); M.D. Fla. Local Rule 7.05(*l*)(2).

---

[7] Without question, notwithstanding Iosipan's unsuccessful attempts to notify Turner of Neptune's lien and published sale date, Turner had actual knowledge of the towing and Neptune's claims. To the extent Workman (and Turner) have attempted to show that Neptune's Notice of Lien was mailed to a wrong address, Turner has herself to blame because she did not maintain a correct address with the Coast Guard. To Iosipan's credit, he did everything he could to notify Turner. That Turner had actual knowledge of Neptune's claim of lien is evidenced by Workman's call to Iosipan and the two calls by two different attorneys. In any event, any claimed deficiency in the notice is of no moment.

[8] To the extent Workman attempted to prove that a sale occurred through the testimony of Iosipan's former business partner, Richard Pope, it is apparent that any purported sale transaction was not actually completed, since Neptune has possession of the vessel.

Between March 2009 and May/June 2009, the DRUMBEAT II was docked in a slip near the airport at a rate of $760 per month. She was relocated to a different slip in May or June of 2009, where she has remained moored at a rate of $960 per month, plus approximately $42.00 for electricity. In addition to storage, Neptune has incurred costs for inspecting the vessel and dewatering her twice a week at a cost of $150.00 per day, or approximately $1200 on a monthly basis. Based on the testimony and evidence, the rates for storage and dewatering are reasonable,[9] and therefore, will be awarded.[10] Neptune shall also recover the cost of the marine survey ($856) and U.S. Marshal fees ($2500).[11]

**Affirmative Defenses**

Workman's statute of limitations defense is not a defense to Neptune's claims to enforce its liens against the vessel *in rem*. The equitable doctrine of laches governs the time to sue in admiralty cases, not federal or state statutes of limitations. *Puerto Rico Ports Auth. v. Umpierre-Solares*, 456 F.3d 220, 227 (1st Cir. 2006)("In an admiralty case, maritime law and the equitable doctrine of laches"-not federal or state statutes of limitations-"govern the time to sue."). And, with the exception of the Salt Creek Marina lien, there has been no showing of prejudice to support the defense of

---

[9] Although Neptune requested storage costs of $4500 per month, Neptune failed to prove such expenses. The amounts awarded are consistent with Magistrate Judge Porcelli's order setting a bond for the release of the DRUMBEAT II (Dkt. 79). Specifically, Judge Porcelli determined that Neptune's fairly stated claim consisted of storage expenses for a period of one year at a rate of $1,000 per month and dewatering costs for 53 weeks at a rate of approximately $300 per week (Dkt. 79, p. 6). Contrary to Neptune's apparent suggestion, Judge Porcelli did not determine that Neptune's fairly stated storage claim was $4500 per month.

[10] Early on, the parties were warned that the cost of maintaining the vessel during the pendency of this proceeding could exceed the value that would be recovered. (Dkt. 56 at 5). Notwithstanding an order setting bond (Dkt. 79), Turner never posted a bond for the release of the vessel. On more than one occasion, Neptune filed a motion requesting to conduct an interlocutory sale of the vessel. Each time, Turner and Workman vigorously opposed any interlocutory sale. Ultimately, the motions were denied because, among other things, trial was imminent. However, due to multiple medical events experienced by Turner, the trial could not be completed as expected. During that time, however, Neptune continued to incur expenses in its capacity as substitute custodian.

[11] Neptune's request for Court costs and expenses for documents obtained from the U.S. Coast Guard for use in this litigation are more appropriately addressed by filing a bill of costs pursuant to Fed. R. Civ. P. 54(d).

laches. Further, to the extent he pleads fraud on the court, perjury, false invoices, false and fraudulent liens, and false assignments, the Court find no persuasive evidence of such, if such affirmative defenses exist.

Contrary to Workman's defense that Neptune lacks standing to enforce the claims of the various service providers, maritime liens are freely assignable. *See, e.g.*, *Inland Credit Corp. v. M/T BOW EGRET*, 552 F.2d 1148, 1150-51 (5th Cir.1977); 2 Benedict on Admiralty § 26 (2010). And Neptune has submitted evidence showing written assignments of the liens from Lippincott, Salt Creek Marina, and Capt. Banger. Further, with respect to Maltrap's lien, oral assignments are valid, so long as a demonstration is made that the assignee intended to transfer the lien and that the assignment was accepted. *Boulevard Nat. Bank of Miami v. Air Metal Indus., Inc.*, 176 So. 2d 94, 97-98 (Fla. 1965); *Mangum v. Susser*, 764 So. 2d 653, 655 (Fla. 1st DCA 2000); *Stewart v. Hooters of America, Inc.*, 2011 WL 2555797, at *1 (11th Cir. June 28, 2011). The testimony established that Maltrap intended to transfer the lien and that Neptune accepted the assigned lien.

Neither is the absence of a written contract fatal to Neptune's claim based on the services rendered by Maltrap and Capt. Banger. An enforceable maritime lien is not dependent on a written contract to perform the underlying services. Indeed, maritime liens can attach "'even if the vessel owner ha[d] not personally contracted' for the services performed." *Crimson Yachts*, 603 F.3d at 870 (quoting *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987)). All that is required is that necessaries were rendered to the vessel "at the direction of the vessel's owner or agent." *Sweet Pea Marine*, 411 F.3d at 1249. Accordingly, notwithstanding that Neptune has not submitted a writing showing that Workman or Turner agreed to pay for Maltrap's or Capt. Banger's services, a maritime lien arose by virtue of an oral agreement between the providers and Turner, and Workman as her agent.

Finally, construed liberally, Workman's affirmative defenses of estoppel, waiver, breach of contract, tortious interference, lack of notice of eviction and liens, failure to mitigate, lack of opportunity to cure, assumption of risk, set offs, contributory negligence, failure of consideration, release and "Rule 11 Violations" are without merit, unsupported by the evidence, and therefore rejected.

**Turner's claims**

Turner's Amended Complaint included five claims: Possession, Wrongful Arrest, Conversion, Wrongful Towing, and Bailment. None of these claims were supported by the evidence.

The possessory claim fails because, following the transfer to Workman, Turner no longer has an ownership interest in the DRUMBEAT II and therefore lacks standing to maintain a possessory action. In any event, the vessel's current owner is not entitled to possession, as the liens on the DRUMBEAT II will be satisfied from the proceeds of the sale of the vessel. *See Crimson Yachts*, 603 F.3d at 870.

Turner also has not established that the vessel was wrongfully arrested. Maritime liens, including liens for necessaries, are enforced by an *in rem* action against the vessel, which requires an arrest of the *res. Crimson Yachts*, 603 F.3d at 868; Fed. R. Civ. P., Supp. Rules for Certain Admiralty and Maritime Claims (Rule C). A party cannot maintain an action for wrongful arrest unless the arrest arose from malice, bad faith, or gross negligence. *Furness Withy (Chartering), Inc., Panama v. World Energy Sys. Assocs., Inc.*, 772 F.2d 802, 808 (11th Cir. 1985) ("*Furness Withy I*"); *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937). Considering its valid, unsatisfied maritime liens, Neptune acted in good faith in securing the vessel's arrest.

It is of no moment that Turner did not receive notice or an opportunity to be heard prior to the arrest of the vessel. Neither the Supplemental Admiralty Rules nor the Local Rules of this Court

require notice or a hearing prior to the arrest. Indeed, such a requirement would run counter to the successful enforcement of a lien which is intended to prevent ships from "escap[ing] their debts by sailing away." *Crimson Yachts*, 603 F.3d at 870 (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc)).

Turner's claim for conversion likewise fails. "In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present or immediate right of possession of the property in question." *United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005) (quoting *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th DCA 1980)). Turner has not had possession of the vessel or an immediate right to possession since the DRUMBEAT II was towed by Neptune.

As discussed, Hribar properly authorized the DRUMBEAT II to be towed after the vessel had, by all appearances, been abandoned by owners who failed to pay the agreed dock fee. Based on its efforts, Neptune obtained a maritime lien for salvage. Until such time as this lien was satisfied or adequate security was given, Neptune was entitled to retain possession of the vessel, to the exclusion of her owner(s). *See Treasure Salvors, Inc.*, 640 F.2d at 567.

To be sure, Neptune initially demanded an amount for the release of the vessel which was far in excess of the liens that Neptune has now been determined to have held. But there is no evidence that Turner offered adequate security or made a reasonable tender to satisfy Neptune's liens. Turner did not have an immediate right to possession and therefore her claim for conversion fails. Further, to the extent Turner's conversion claim is based on the same facts as her claim for wrongful arrest, it fails for the additional reason that Neptune's actions were not taken in bad faith. *See Furness Withy (Chartering), Inc., Panama v. World Energy Sys. Assocs., Inc.*, 854 F.2d 410, 411-12 (11th Cir. 1988) ("*Furness Withy II*").

Turner also has not established a claim for wrongful towing. As discussed, the vessel was

properly towed. Contrary to Turner's argument, the inapplicability of Fla. Stat. § 713.78 does not make the towing wrongful. It simply means that Neptune is not entitled to a state law lien for towing the vessel.

Turner's only claim with arguable merit is her bailment claim. "In a bailment situation, the plaintiff makes a prima facie case for damages when he shows that the bailed property was delivered to the bailee in good condition and that it was damaged while it was in the care, custody, and control of bailee." *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1299 (11th Cir. 2007) (quoting *Parker v. Miracle Strip Boat & Motors Headquarters, Inc.*, 341 So. 2d 197, 198 (Fla. 1st DCA 1976)). "To overcome the resulting inference of negligence, the defendant must present evidence tending to show that he did not breach his duty of ordinary care." *Parker*, 341 So. 2d at 198.

There is evidence that the DRUMBEAT II was damaged while in Neptune's custody and that Neptune may have disposed of certain property on board the vessel. Iosipan admitted that the DRUMBEAT II received a ding in her hull after she was towed. And Workman testified that several items were missing from the DRUMBEAT II when she was inspected. But Workman's testimony is not altogether credible, as Iosipan testified that many of these items had been moved to his workshop. Iosipan admitted, however, that prior to being appointed substitute custodian, he disposed of some items of property that had been present on the DRUMBEAT II at the time of towing.

Regardless of whether the damage to the DRUMBEAT II or the disposal of property constituted a breach of Neptune's duty of ordinary care, Turner has not offered any admissible evidence to quantify her damages. She has not shown the amount of damage the DRUMBEAT II

sustained or the value of each item that Neptune disposed of.[12] Absent such proof, Turner is not entitled to an award of damages on her bailment claim.

## Conclusion

Accordingly, it is ORDERED and ADJUDGED that

(1)      Neptune shall have maritime liens on the DRUMBEAT II as follows:

| | |
|---|---|
| Necessaries supplied by Maltrap: | $1260.56, plus prejudgment interest since November 30, 2005 |
| Necessaries supplied by Lippincott: | $3489.55, plus prejudgment interest since December 12, 2005 |
| Necessaries supplied by Salt Creek Marina: | $2784.00 |
| Necessaries supplied by Capt. Banger: | $1356.25, plus prejudgment interest since December 3, 2008 |
| Salvage: | $3000.00 |
| **Total maritime liens:** | **$11,890.36, plus prejudgment interest** |

(2)      Neptune shall be reimbursed the following expenses for storing and maintaining the salvaged property prior to its arrest:

| | |
|---|---|
| Storage from March 2009 through May 2009: | $2280.00 |
| Storage/electricity from June 2009 through November 2009: | $6012.00 |
| Dewatering from March 2009 through November 2009: | $10,800.00 |

---

[12] Turner attempted to introduce a list of the property missing from the DRUMBEAT II, which included estimates of the value of each missing item. The document had not been produced to opposing counsel prior to trial. Although the document was received into evidence to assist Workman in testifying, all estimations of the value of the missing items were redacted. Notwithstanding the redaction of the estimates of the missing items, Workman did not offer any testimony as to their value, and Turner chose not to testify at all.

| **Total pre-arrest expenses:** | **$19,092.00** |

(3)    Neptune shall have an administrative claim for *custodia legis* expenses, as follows:

| Storage/electricity from December 2009 through September 2011: | $22,044.00 |
| Dewatering from December 2009 through September 2011: | $26,400.00 |
| Marine survey: | $856.00 |
| U.S. Marshal fees: | $2500.00 |
| **Total administrative expenses:** | **$51,800.00** |

(4)    The clerk is directed to ENTER JUDGMENT against the DRUMBEAT II, her engines, tackle, apparel, and other appurtenances, *in rem*, in the amount of $30,982.36, plus prejudgment interest. The clerk is further directed to ENTER JUDGMENT in favor of Neptune on Turner's Amended Complaint.

(5)    The clerk is directed to release the cash bond in the amount of $2784.00 (Dkt. 298) to Neptune. Such release shall not occur until 14 days have passed after the entry of this order. Fed. R. Civ. P. 62.

(6)    The vessel the DRUMBEAT II, and her engines, tackle, apparel, and other appurtenances, shall be sold free and clear of all claims against the vessel.

(7)    The United States Marshal is authorized and directed to sell the vessel the DRUMBEAT II at public auction. Such sale shall not occur until 14 days have passed after the entry of this order. Fed. R. Civ. P. 62; M.D. Fla. L. R. 7.05(p). The notice, sale, payment, and confirmation shall be governed by Local Rule 7.05.

(8)    The charges incurred by Neptune as Court-appointed Substitute Custodian in the amount of $51,800.00, along with the charges incurred by the U.S. Marshal, shall be taxed against the proceeds of the sale as *custodia legis* expenses.

(9)     Following confirmation of the sale by the Court, all proceeds shall be paid into the Court registry. Upon motion of the parties, the proceeds will be disbursed in accordance with this order.

(10)    The Court reserves jurisdiction over claims related to items of property which were listed on the U.S. Marshal's inventory at the time of arrest but do not appear on a final inventory.

(11)    The clerk is directed to CLOSE this case.

**DONE AND ORDERED** this 21st day of September, 2011.


**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record
Unrepresented Parties
United States Marshal